LEWIS, J.
The Florida Board of Bar Examiners petitions this Court to consider amendments to the Rules of the Supreme Court Relating to Admissions to the Bar. We have jurisdiction. See art. V, § 15, Fla. Const.
The Board has petitioned to amend or create these rules: rule 1-14.1 (purpose of background investigations); rule 1-65 (disclosure of information); rules 1-70, 1-71, and 1-72 (immunity and privilege); rule 2-10 (application qualifications); rules 2-11, 2-11.1, and 2-11.2 (technical competence, education qualification, and alternative method of educational qualification); rule 2-13.25 (satisfaction of court-ordered restitution and disciplinary costs); rule 2-13.5 (finding applicant or registrant unqualified); rule 2-14 (petitions for rehabilitation); rule 2-22 (deadline for filing bar application); rule 2-28 (rehabilitation ap *246 plication fee); rules 2-30.1 and 2-30.2 (petitions relating to administrative hearings filed with the Board and with the Court); rule 3-10.2 (essential eligibility requirements); rule 3-17.3 (fee for extraordinary expenses); rule 3-23.6 (Board action following formal hearing); rule 3-23.7 (findings of fact and conclusions of law); rule 4-13 (educational qualifications); rules 4-13.1 (educational qualifications); rule 4-13.3 (definition of degree requirements); rule 4-13.4 (alternative method of educational qualification); rules 4-17, 4-17.1, and 4-17.2 (special testing accommodations); rule 4-26.2 (pass/fail line); rule 4-41 (exam application and supporting documents); rules 4-42.3 and 4-42.4 (deadline and cut-off for special testing accommodations); rule 4-52 (consequences of violation of rules); rule 4-64 (invalidation of examination results); and rule 4-65 (invalidation of exam scores).
The proposed amendments were published in The Florida Bar News on January 15, 2000, with an invitation for comments. Comments were submitted concerning rules 1-70 and 4-26.2. After consideration of the Board’s petition and the comments received concerning the amendment to rule 1-70, we agree with the Board’s rationale and adopt that amendment as proposed. For the reasons stated below, we also adopt the amendment to rule 4-26.2.
We have received comments and recommendations from many individuals and groups concerning the Board’s suggested amendment to rule 4-26.2, including the deans of six Florida law schools;[1] the Florida Chapter of the National Bar Association; the Florida State Conference of NAACP Branches; the George Edgecomb Bar Association; the Society of American Law Teachers; Testing For the Public; attorneys Kevin C. Frein, Harley Scott Herman, David W. Langham, Kimberly M. Reid, Henry T. Sorensen II, and Wilfred C. Varn; and Mr. Tom Swavely. Additionally, Board Member Noel G. Lawrence filed a “minority report.”
In the course of the life of any institution or professional organization with acknowledged mandatory evaluation for membership and minimum requirements for admission necessary to protect the citizens of Florida, the entity must pause and evaluate its participation prerequisites to ensure that the conditions operate to adequately protect the public and also work to fulfill the overall goals and aspirations of the organization or profession itself. Reexamination of this type is necessary and essential to avoid the possibility that apathy or passiveness take root and undermine the laudable goals of the organization by allowing unqualified applicants to be admitted, although posing unacceptable and unnecessary risks to society. Nowhere is this principle more important than in the process of examining the standards for admission to The Florida Bar and its testing and certification process.
The Florida Board of Bar Examiners, as the administrative arm of this Court charged with the task of establishing and maintaining responsible admissions requirements, see Fla. Bar Admiss. R. 1-14.2, has been delegated the important responsibility of safeguarding the interests of all Floridians. This serious responsibility stems from the recognized principle that an attorney licensed to practice law in *247 this state is capable of both rendering tremendous good, but is also in a position to inflict harm if care and caution are not implemented. The members of The Florida Bar, by their very nature as attorneys, are licensed to become intimately involved in the lives and matters of clients, and anything less than exacting standards of admission exposes Floridians to unacceptable risks. Thus, before the Board can recommend to this Court that an applicant be admitted to the Bar, it must be confident that the person is qualified with regard to both character and fitness, and also possesses a certain minimum technical and educational competence. See Fla. Bar Admiss. R. 1-16.
In 1998, because it had been almost twenty years since the last inquiry toward any examination or adjustment of the pass/ fail line had been considered or performed, the Board began to reevaluate the standards underlying the current pass/fail line of 131. The Board retained Dr. Stephen P. Klein, the preeminent national expert on the psychometric characteristics of bar examinations,[2] to perform a comprehensive review of the bar examination pass/fail line. Based upon interaction with Dr. Klein, the Board conducted two independent studies to evaluate whether the bar examination score acceptable for admission should be increased, lowered, or remain the same.
In the first of two studies, Dr. Klein requested the actual graders of essay questions from the February and July 1999 Florida Bar examinations to assign passing scores to particular essay responses. These passing scores were then used to determine the acceptable passing level — the percentage of applicants attaining scores at or above the average of the graders’ individual passing scores. When total bar exam scores for the February exam were scaled and placed along the spectrum of passing rates, Dr. Klein calculated that an average score of 133.5 would have been the proper passing rate. Application of the same criteria resulted in an average total scaled score of 141 for the July 1999 exam. These studies alerted the Board to and demonstrated problems with the current Florida standards.
The second study involved the implementation of six panels comprised of four to five members. Each panel included a Florida Circuit Judge, an associate dean or professor from a Florida law school, a Board of Bar Examiners member, and members of The Florida Bar engaged in the practice of law. After proper preparation, each panelist was given a set of forty exam answers and asked to place each answer in one of the following categories: clear fail, marginal fail, marginal pass, or clear pass. Upon analysis, the results of this grading and evaluation process resulted in the conclusion that average pass/fail lines of 139.5 for the July 1998 exam, and 135 for the February 1999 exam should be implemented. Indeed, the undoubtable final conclusion was that each of the panels clearly condemned the current pass/fail line. Clear evidence — in fact, the only evidence before this Court, persuasively reveals that the current 131 pass/fail line is unacceptable.
Based upon these studies, Dr. Klein reported to the Board that an averaging of each of the panels’ standards resulted in a scaled score of 137. After months of study and following thorough discussion and consideration of the issue at its October 1999 meeting, the full Board voted twelve to *248 two to recommend that this Court increase, through a two-stage process, the pass/fail line from the present 131 to 136. It is also interesting to note, however, that one of the Board members casting a vote against the proposed change from 131 to 136 did so because the member was of the opinion that 136 was not high enough to protect the public.
It is imperative to note multiple important facets of the process undertaken by the Board here. First, all of the institutions and actors in the current system of legal education and practice were represented in these studies. The interaction of these educators, judge's, bar examiners, and attorneys produced a clear determination that the current standard does not reflect the level of competence which should be expected of a practicing attorney in Florida to adequately protect the public. Indeed, the studies produced an explicit call to elevate the standard for admission to the Bar in an attempt to protect the public from possible exposure to harm created by incompetent attorneys. Thus, the Board responded by urging this Court to increase the pass/fail line to a proper level, as demonstrated by the evaluations.
Second, the current pass/fail line of 131 does not have, and never has had, any empirical or justifiable relationship for its existence or to ensure minimum competence to practice law. Prior to 1961, an applicant was required to answer seventy percent of the questions correctly to achieve a passing score, and for the twenty years following the discontinuation of this method in 1961, the pass/fail line varied from one examination to the next because the pass/fail line was established by averaging the top ten scores on the exam and subtracting twenty points from this average score. In 1981, however, this Court changed the grading method to a scaled procedure, and adopted a pass/fail score of 133 — a level not justified by any empirical studies or verifiable standards and without any qualitative foundation. See Petition of the Florida Board of Bar Examiners for Amendment of the Rules, 397 So.2d 627 (Fla.1981). Then, without any explanation, this Court sua sponte reduced the pass/fail line from 133 to 131 in 1982. See Florida Board of Bar Examiners re Amendment to Rules, 416 So.2d 803 (Fla.1982). Clearly, an examination of the lifeline of the Florida pass/fail score, as well as the studies commissioned by the Board highlight the utterly baseless nature of the current standard historically applied.[3] Additionally, each and every study underwritten by the Board reveals that the current Florida Bar admission standard does not adequately reflect the minimum skills required for the competent practice of law. This action does not encompass a debate over whether the current Florida bar exam format is the ideal tool for measuring attorney competence. Indeed, we are not opposed to considering additional testing methodologies and expanding the testing required for admission if such is advisable. In sum, we must accept for the purposes of today’s decision that the bar exam format as it exists now is an accurate system of measuring competence, because we are not prepared to shift to a system of open *249 admission without testing which would be the result of accepting the opposition’s arguments. Criticism of the current testing method is inapposite and does not address the issue before us today. Therefore, there is absolutely no reason to grant admission to applicants who do not possess the body of knowledge necessary to adequately represent the citizens of Florida under the proper standards for the testing now administered. The bar exam is in place to protect Floridians from incompetent lawyers, and any disagreement over the actual composition of the test, which we are always open to consider, does not change the clear indication of Dr. Klein’s studies: that the current pass/fail score for the examination must be raised.
The competent, verified empirical evidence compiled by Dr. Klein and the Board reveals that the current standard for admission has absolutely no relationship whatsoever to ensuring the minimum competency of those admitted to the Florida Bar. This Court acts today to rectify the situation. In essence, all of the credible data and conclusions presented to this Court by the Board illuminate that the present standard at this time is invalid and totally without foundation. It is nothing more than a number picked from the air. Because it is without validity, the people of Florida would be placed at risk if we fail to approve the higher standard. The situation presented to this Court is simple: While the studies performed by the Board working with experts and all segments of the Bar direct that we should raise the pass/fail line, there is simply no rational, objective basis for leaving the admission score at its current low level.
It is certainly worth noting that the Board and Dr. Klein have thoroughly defended their studies against attack by opponents to the increase of the pass/fail standard, and repelled all criticism. Indeed, the law school deans, as opponents to the Board’s pass/fail line recommendations, relied upon the critique of Dr. Klein’s studies that Dr. Michael Kane provided to the Minnesota Board of Law Examiners in August 2000. However, it is more important to note that upon receiving Dr. Klein’s response to his comments, Dr. Kane admitted and concluded that “the general approach taken in the 1997 study was appropriate. My objections are to the implementation.” Thus, even an expert employed specifically to impeach Dr. Klein’s methodology could not take issue with his techniques. Kane’s only continuing objection to Dr. Klein’s usual standard-setting method was to an asserted graders’ lack of instruction on the proper setting of pass/fail standards, without a factual basis for such objection. Because the participants in Dr. Klein’s Florida studies were in fact fully briefed and informed on the purposes and goals of the bar examination prior to their involvement, this complaint is of questionable validity at best. Indeed, in light of the final exchange between Drs. Klein and Kane, the points of criticism presented by Dr. Kane which caused Minnesota to delay the increase of its pass/ fail standard are both entirely unpersuasive and not controlling here.
Based upon the information presented to this Court, it can only be concluded that the Board properly engaged in a scientifically reliable method of evaluating the pass/fail line by gathering a cross-section of the legal community, providing these participants with thorough guidance on how to establish passing scores, and evaluating the resulting data in a manner entirely consistent with and totally within testing and measurement norms. A comparison of Dr. Klein’s study performed in the instant action with some of his past studies reveals that he has not been biased in favor of arbitrarily increasing pass/fail lines, and he has consistently applied re *250 spected methods. Indeed, when his procedures were used in Pennsylvania and Puerto Rico, the results revealed that these jurisdictions had pass/fail lines that were artificially high. It is clear that the studies performed for the Board by Dr. Klein were a scientifically valid, responsible method of objectively analyzing the basis for Florida’s pass/fail line. Because the studies clearly reveal that the line is incorrect and that a responsible cross-section of the legal community is of the objective view that the present scale is unacceptable, it must be changed and it would be irresponsible for this Court to simply ignore the empirical data presented.
Hypothetical application of the proposed new passage score has made clear that increasing the pass/fail line would impact all applicants evenly, regardless of gender, race, or ethnicity. Indeed, despite many allegations of such, and our keen attention to the possibility of such, no data before this Court supports the contention that raising the pass/fail score will adversely impact minority applicants in a manner any different from other applicants. While it is acknowledged that certain current disparities between racial groups may remain, facts demonstrate to us that such are not a product of the examination or its scoring, and it must be clear to all that the key to diversity and equality in bar admissions is not to be accomplished by promoting unqualified persons to be certified competent contrary to evaluation — indeed, the hallmark of fairness and egalitarianism has always been a commitment to ensuring the recognition of all those who have proven their capabilities, regardless of ethnicity or background.
The record shows that the Board of Bar Examiners has continuously probed and evaluated the examination for testing bias, a practice that is to be commended and which must be continued in a manner forever vigilant. Indeed, we certainly acknowledge the concerns of those responding to our call for comments who urged this Court to examine the putative discriminatory effects of increasing the pass/ fail line. We-have exhaustively done so, and have found none. The contention that an increase in the pass/fail line will disproportionately adversely affect minority applicants is simply opinion contrary to present fact. The empirical studies contained in the record before this Court which project the impact of an increase in the admission standard have generated clear statistical data which refutes the claim that minorities will be disproportionately affected, and simply saying that minorities will be adversely affected does not serve to contradict this data in any cognizable fashion. The hypothetical application of the proposed new passing level to recent bar examinations presents facts to us which demonstrate beyond dispute that the only people disadvantaged by an increase in the pass/fail line would be those who are not qualified to become practicing members of The Florida Bar in the first place, which crosses all populations equally, and there is no evidence of disparate gender, racial, or ethnic impact.[4]
If the opponents to the Board’s proposal could, in some fashion, factually demon *251 strate that the bar examination is a discriminatory tool, then this Court would certainly be required to address the problem and take corrective action. Indeed, the Court should give, and has given, serious consideration to the comments of the Board’s opponents here, and must continue to determine whether future bar examination results, without regard to any particular passage line, reflect any possible bias or unfairness to any group. However, there is absolutely no evidence before this Court showing that the proposed bar examination scheme would discriminate in its purpose or application against any group. The only discrimination occurring here is that which should occur — differentiation between those candidates qualified to serve the public and those who do not possess the minimum competence to practice law, so that we may fulfill our obligations to the citizens of this state.
Based upon the foregoing, we conclude that the Board’s justifications for the proposed amendments are sound and adopt them as reflected in the appendix to this opinion. As noted in the appendix, the amendments to rule 4-26.2 shall occur in the two-stage process advocated by the Board. The pass/fail line is increased to 133 effective July 1, 2003, and raised further to 136 on July 1, 2004. We have edited the rules for style and grammatical accuracy. The new language is indicated by underscoring; deletions are indicated by struck-through type. These rules shall take effect immediately.
It is so ordered.
ANSTEAD, C.J., and WELLS, J., and HARDING, Senior Justice, concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., and SHAW, Senior Justice, concur.

. Dean Donald E. Lively, Florida Coastal School of Law; Dean Joseph D. Harbaugh, Nova Southeastern University Shepard Broad Law Center; Dean John Makdisi, St. Thomas University School of Law; Dean W. Gary Vause, Stetson University College of Law; Dean Jon L. Mills and Associate Dean George L. Dawson, University of Florida College of Law; and Dean Dennis O. Lynch, University of Miami School of Law.

. See generally DeRolph v. Ohio, 98 Ohio Misc.2d 1, 712 N.E.2d 125, 134-35 (Ct.Com.Pl.1999) (detailing the qualifications of Dr. Klein, as well as a selection of the psychometric studies he has designed and conducted).

. It is telling that under the current 131 pass/ fail line, examinees only need to answer fifty-six percent of the total questions correctly to achieve a passing score. Indeed, increasing the standard to 136 would only require applicants to answer fifty-nine percent of questions correctly. Obviously, both of these standards fall far below the seventy percent correct answer rate required of applicants prior to 1961.
Additionally, it is worth noting that thirty-three jurisdictions presently have higher pass/ fail standards than Florida, and this state’s 131 pass/fail line is even three points lower than the national average.

. Indeed, an examination of the predicted results reveals that an increase in the pass/fail line would result in a higher percentage of the black University of Miami law students passing the bar examination than their white classmates (133 pass/fail line: white — 80% passage, black — 89% passage; 136 pass/fail line: white — 70% passage; black — 78% passage), and a higher percentage of the Hispanic graduates of Florida State University College of Law passing the bar examination than white FSU examinees (133 pass/fail line: white — 84% passage, Hispanic — 91% passage; 136 pass/fail line: white — 80% passage; Hispanic — 91% passage).